OPINION OF THE COURT
Edward J. Greenfield, J.
The motions of defendant Fernandez to dismiss the complaint for failure to state a cause of action and for summary judgment are consolidated for disposition with plaintiff’s motion for sanctions for failure of that defendant to comply with requirements for discovery, and defendant’s cross motion for leave to amend the answer.
Plaintiff, claiming breach of a “partnership agreement”, asks the court for a declaratory judgment, for the imposition of a constructive trust, and for an accounting, arising out of his contention that defendant Fernandez, winner of a $2.8 million lottery prize, promised to share her winnings equally with him. The complaint consists of two causes of action. The first alleges *225 that plaintiff, a minor, entered into an oral “partnership agreement” with Mrs. Fernandez, who, believing the youth to be deeply religious and a strong believer in “St. Eleggua”, prayers to whom might help her win the prize, promised that if plaintiff took her $4 and purchased the tickets and selected the numbers, and any of the tickets he purchased won, they would share the prize equally. One of the tickets he claims to have purchased for her in fact did win a prize of $2.8 million, and plaintiff claims that the refusal to give him 50% of the proceeds constitutes a breach of contract. The second cause of action alleges that despite the agreement Mrs. Fernandez presented the winning ticket to the New York State Division of the Lottery of the Department of Taxation claiming to be the sole owner of the ticket. Plaintiff seeks a declaratory judgment as to the rights of the parties, and asks for the imposition of a constructive trust, so that the proceeds hereafter would be paid equally. He also asks for an accounting for all moneys already paid out and received.
Defendant Fernandez, having answered by interposing a general denial, now moves to dismiss on three grounds: (i) that the alleged oral agreement is barred by the Statute of Frauds because it is incapable of being performed within one year; (ii) that the agreement called upon a minor to do an illegal act, and is therefore unenforceable; and (iii) that it is impossible to prove in a court of law that the conditions precedent to the effectiveness of the contract have taken place.
On the motion addressed to the complaint alone, which does not spell out the controlling facts but alleges a breach of contract in very broad terms, it is difficult to focus on the grounds for the motion to dismiss. However, defendant has also asked for summary judgment, and both sides have seen fit to augment the bare facts of the complaint with factual affidavits which flesh out and clarify the controversy.
Defendant, 38, the mother of three children, who before good fortune befell her was on welfare, vehemently denies that she ever asked plaintiff, a 16-year-old friend of her son, to buy lottery tickets or to pick the numbers for her, and she emphatically denies any suggestion that she offered to share her winnings equally with him. Denials, however, as she and her attorney recognize, are properly reserved as issues of credibility for the trial. There are, however, certain undisputed facts set forth in the affidavits which require the court to make legal determinations as to the viability of the cause of action wholly independent of disputes as to credibility.
*226 STATUTE OF FRAUDS
Defendant contends that the alleged oral agreement to share the prize equally, even if plaintiff’s allegations be accepted as true, runs afoul of the Statute of Frauds, because the prize of $2,877,203.30 is to be paid out by the State Lottery Division in annual installments over a 10-year period.
General Obligations Law § 5-701 specifies:
“a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promises, or undertaking:
“1. By its terms is not to be performed within one year from the making thereof”.
Defendant contends that the alleged agreement cannot be performed within one year. She relies on the line of cases in which an oral agreement to pay commissions over a period of several years has been held to be unenforceable. (See, for example, Zupan v Blumberg, 2 NY2d 547; Gurney, Becker & Bourne v Simon, 89 AD2d 795; Grossberg v Double H Licensing Corp., 86 AD2d 565.) Similarly treated are contracts for employment for more than one year. (Dorman v Cohen, 66 AD2d 411; Weintraub v Rapid-American Corp., 61 AD2d 743.)
Defendant claims the 10-year payout of the total prize here calls for analogous treatment. In this case however the contract could be performed well within one year. Defendant was to furnish the funds with which to purchase the ticket. Plaintiff had to purchase the ticket, select the numbers, return it to defendant, and pray. The winning numbers were scheduled to be drawn, and were drawn, within days, and at that time the obligations of the parties became fixed. The defendant would then have to have notified a third party, the State Lottery Division, that all future payments were to divided equally between herself and the plaintiff, a task which she could perform within days. At that point the obligations of each side would have been performed. (North Shore Bottling Co. v Schmidt & Sons, 22 NY2d 171.) The fact that the payout would be extended over several years is of no moment, for the liability, if any, was fixed, the amounts known, and all that remained was the ministerial act of having the annual payouts divided. That is quite different from an agreement by a party to pay out a percentage of sales or earnings over a period of years, which may call for future services, and where the amounts cannot be established until well into the future.
*227 The agreement here more closely resembles that in Costello Assoc. v Standard Metals Corp. (121 Misc 2d 282, mod on other grounds 99 AD2d 227). There the agreement involved was for an executive search agency to provide the name of a prospective employee to be hired the following year, payment being based on a percentage of the first year’s compensation. There, despite the contention that payment would necessarily take more than a year from the date of the agreement, it was held that there was full performance of the contract within the year, and the obligation to pay accrued upon performance. The actual computation of the amount due, even if it were to take more than a year, was of no significance, since this was a mere ministerial act. The controlling criterion is the time at which the obligation becomes, or could become fixed. If all the contingencies can occur, and all conditions precedent can be performed within the one-year period, with nothing remaining to be done thereafter except the act of payment, there is no violation of the Statute of Frauds.
The 10-year payout of the prize in this case is the measure of the obligation of the State Lottery Division. The alleged obligation of the defendant to share that prize with plaintiff was fixed well within the one-year period.
ILLEGALITY
Defendant contends that inasmuch as the alleged agreement called upon the plaintiff, who was under 18, to purchase the lottery ticket, it called for the performance of an illegal act, so that the enforcement of the contract by our courts would contravene the public policy of the State prohibiting the encouragement of gambling by minors.
Undeniably, the public policy of the State, as exemplified in its Constitution (NY Const, art I, § 9 [1]), prohibits gambling or lotteries except those operated by the State. Its proceeds are applied to aid education, with appropriate legislation to prevent offenses. The policy of the State disfavors gambling, unless done in accordance with laws and regulations strictly complied with. (Molina v Games Mgt. Servs., 89 AD2d 69, 72, affd 58 NY2d 523.) Thus a comprehensive statutory scheme was enacted in 1976 to set up a lottery commission to supervise, with standards as to the eligibility and licensing of ticket agents, the sale of lottery tickets, and the distribution of prizes. (Tax Law §§ 1601-1616.) Section 1610 dealt with barring participation by minors. It provides:
“§ 1610. Sales to certain persons prohibited
“a. No ticket shall be sold to any person under the age of eighteen years, but this shall not be deemed to prohibit the *228 purchase of a ticket for the purpose of making a gift by a person eighteen years of age or older to a person less than that age. Any licensee or the employee or agent of any licensee who sells or offers to sell a lottery ticket to any person under the age of eighteen shall be guilty of a misdemeanor.
“b. No ticket shall be sold to and no prize shall be paid to any of the following persons:
“(i) any member, officer or employee of the division; or
“(ii) any member, officer or employee of the department of taxation and finance whose duties directly relate to the operation of the state lottery; or
“(in) any spouse, child, brother, sister or parent residing as a member of the same household in the principal place of abode of any of the foregoing persons.”
The statute plainly sets forth two categories: (a) those to whom no ticket may be sold, and (b) those to whom no ticket may be sold and to whom no prize shall be paid. Persons under 18 are in the first class.
Thus it is clear that the prohibition against some degree of participation by those under 18 years of age is not absolute. A gift of a ticket or a prize to a child of any age is permitted, for it is specified that a minor may be the donee of a winning ticket purchased by an adult. (See, for example, Mizrahi v Mizrahi, 57 Misc 2d 1021.) It is further to be noted that while sellers are not permitted to sell to minors, they are not included in that class of persons to whom no prize may be paid. Had it been the intention of the Legislature to prohibit prizes to minors who had illegally purchased tickets, it could have spelled out that intent in section 1610 (b). It did not. Instead, Tax Law § 1613 (b) specifies the procedures for distributing prize money to minors. This differs from the situation in Johnson v New York Daily News (97 AD2d 458, affd 61 NY2d 839), where the 14 year old whose name appeared on a winning “Super Zingo” ticket was barred from recovery because of the restrictive rules specified by the newspaper, as conclusively interpreted by the contest judges. “If a statute does not provide expressly that its violation will deprive the parties of their right to sue on the contract, and the denial of relief is wholly out of proportion to the requirements of public policy or appropriate individual punishment, the right to recover will not be denied.” (Rosasco Creameries v Cohen, 276 NY 274, 278.) I find no pervasive requirement that the protection of public morals calls for denial of enforceability of this alleged contract. “The courts are not free to refuse to enforce a* * * right at the pleasure of the judges, to suit the individual notion or *229 expediency or fairness. They do not close their doors unless help would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal.” (Cardozo, J., in Loucks v Standard Oil Co., 224 NY 99, 111; Intercontinental Hotels Corp. v Golden, 15 NY2d 9; Fosdick v Investors Syndicate, 266 NY 130; Costello Assoc. v Standard Metals Corp., 121 Misc 2d 282, 289, supra.) Courts did refuse to enforce an alleged agreement to divide a lottery prize in Goodrich v Houghton (134 NY 115), and Moskowitz v Cohen (158 Misc 489), but that was at a time when all lotteries were illegal. Here the lottery was legal, and distribution of a prize to a minor is legal. While the purchase of the ticket was not legal, I hold that, in itself, to be no bar to receipt of a share of the prize. (Cf. Cohen v Iuzzni, 25 AD2d 878.)
IMPOSSIBILITY OF PROOF
The most intriguing question presented by this case is whether, in a court of law, plaintiff can prove compliance with the conditions of the contract, as he has set it forth. In an affidavit he submitted specifying in greater detail the nature of the alleged contract, and attempting to explain why an adult would ask him to get the tickets and select the numbers, he said: “Mrs. Fernandez, knowing that I am religious and a strong believer in St. Eleggua asked me, after noticing that the Lotto prize was several million dollars, whether or not I could get my Saint to win the Lottery. I told her that I did not know, but I would try. She thereupon told me that she would give me $4.00 to select four different tickets and that if my St. Eleggua made my selection of the Lottery numbers win, she would go equal partners with me on the prize.” Taking plaintiff’s description of the agreement on its face, it is apparent that the expressed condition precedent for the sharing of the prize is that his piety and prayer would cause heavenly intervention so that his selections would win. How can plaintiff prove on a trial that “St. Eleggua made my selection of the Lottery numbers win”?
On a trial he can testify as to his version of what defendant said. He can testify that he purchased the tickets, and that he selected the numbers. He can testify that he prayed. Who is going tó provide the proof that his prayers were efficacious, and that the saint caused the numbers to win?
It is not a sufficient answer that he prayed, and that one of the tickets he filled out was the winner. That would leave a gap in the proof, which must demonstrate not merely that winning followed prayer, but that plaintiff’s prayer was the causative factor in winning. According to his own story, defendant was not relying on him because he was lucky, but because she believed *230 he had the ability through his piety to intercede with the saint, and persuade the heavenly powers to cause his number to win.*
In other words, according to the terms of the deal as set forth by plaintiff himself, he was to be rewarded, not if defendant’s tickets fortuitously won, but only if his efforts caused her to win. If a party is to receive a sum of money only on the occurrence of a contingent event which he did nothing to bring about, the transaction would be of an aleatory nature and would partake of the elements of an unenforceable wager. (Cf. Liss v Manuel, 58 Misc 2d 614, 617; Irving v Britton, 8 Misc 201, 203.) If defendant was bargaining at all, it was not to afford plaintiff an “all profit-no risk” deal. She wanted something from plaintiff — not his skill in picking the right seller or the right numbers but, because of his piety and devoutness, his “connections” with heavenly powers which would result in divine intervention to cause her to win. In short, she wanted nothing less than a miracle! Plaintiff would have to arrange for a miracle to be brought about by St. Eleggua if he was to share in the winnings. To recover, plaintiff must demonstrate that his prayers caused the miracle to occur.
How can we really know what happened? Is a court to engage in the epistemological inquiry as to the acquisition of knowledge and belief through proof or through faith? Faith is the antithesis of proof. It is a belief which is firmly held even though demonstrable proof may be lacking. It is instinctive, spiritual, and profound, arrived at not through a coldly logical appraisal of the facts but, in Wordsworth’s phrase, by “a passionate intuition”.
“[F]aith is the substance of things hoped for, the evidence of things not seen.” (Paul, Epistle to Hebrews: xi, 1.) How, then, in a court of law, set up to require tangible proof, in a mundane setting, can a litigant establish that his faith and his prayers brought about a miracle? Perhaps they did, but there is no way to prove that in a modern courtroom.
In ages past, controversies were not determined by marshaling an array of rational probative proof. Under Roman law, there was acceptance of divine testimonies, omens, auguries or *231 oracles and the power of dreams. (1 Wigmore, Evidence § 9, n 6 [Tillers rev ed 1983].) In Medieval law the demonstration of miracles in the courtroom and a show of divine intervention were grist for the judicial mill, and trial by combat and trial by ordeal constituted proof of God’s will. But in those days, the function of the secular and the ecclesiastical courts was not sharply separated, and the distinction was not drawn between the lus sali, the law of earth, and lus poli, the law of heaven. (1 Pollock & Maitland, History of English Law, at 112 [2d ed].) Up to the 18th Century, testimony of the power of spells was received in cases where a defendant was accused of witchcraft — the charge that invocation of the spirits caused temporal disasters. (Goebel & Naughton, Law Enforcement in Colonial New York, at 558-559 [1944].) The question of the efficacy of prayer is just the converse. Are we to accept testimony or argument that invoking the power of Heaven rather than of the nether world, followed by a beneficial rather than a sinister result should result in a court decision? In this more workaday and pragmatic era, shaped by tragic experience, the chasm between the temporal and the spiritual world has become unbridgeable. Theology is to be protected against the law, just as the law is to be protected from theology.
It is incumbent on the plaintiff to prove that under the agreement as he alleged it, every condition which had to occur to entitle him to payment did occur, and thereupon defendant’s obligation came into being. The condition was not that the numbers chosen would win, but that the saint was to make the numbers win. Establishing that this occurred is not susceptible to forensic proof. It calls for matters which transcend proof — the existence of saints, the power of prayer, and divine intervention in temporal affairs. “What is faith” said St. Augustine, “unless it is to believe what you do not see?” But judges and jurors must decide based on what they have seen and heard, not on what faith leads them to believe. Beliefs founded on faith cannot readily be tested on motions directed to the sufficiency of the evidence, or on appellate review.
If a rainmaker exacts a promise from a group of farmers to be paid if he makes it rain, he can collect if the trier of facts finds he seeded supercooled clouds with silver iodide and an expert testifies that was the cause of the rain. On the other hand, if the rainmaker performs chants and dances and incantations and it rains within 24 hours, he cannot demonstrate by accepted judicial modes of proof that his acts caused the desired event. The distinction is that in the first example the claimant is shown to have caused something; in the second we do not know if he has.
*232 The distinction must always be made between evidence based on knowledge and conclusions based on belief. This court has no desire to denigrate the power of prayer, matters of spirit, or the workings of the hand of God, but such matters, not susceptible of rational courtroom proof, are for theology and not jurisprudence. Concededly, “there are more things in heaven and in earth * * * than are dream’t of in [our] philosophy.”
To recapitulate, the agreement as alleged by plaintiff required him to comply with four conditions precedent:
1. He was to buy the lottery tickets with defendant’s money.
2. He was to select the numbers.
3. He was to pray to the saint.
4. The saint was to make his selection win.
Condition No. 4 is impossible of courtroom proof. What are the consequences? There are two options open:
(a) Ignore the last condition and enforce the contract.
(b) Declare the contract unenforceable.
The argument for ignoring the condition essentially is that plaintiff has done all he humanly could. He has performed as completely as he was able, and he should not be penalized because he cannot demonstrate that he brought about heavenly intervention. But heavenly intervention is exactly what defendant bargained for — that her pious young friend would bring about a miracle. It was not an incidental part of the agreement — it was its essence, its very heart and soul. Is she to be deprived of half the return on her investment, and plaintiff rewarded, because she was naive and gullible? Elision of the unprovable condition (tantamount to proof by default) would result in a rewriting of the contract into something other than what the parties intended. Defendant did not bargain for a propitious coincidence but for a miracle. If she believed it to have happened, she was free to show her appreciation or to withhold it, but a court could not compel her to do so. “There are no guarantees in life, and good fortune * * * does not invariably bring with it a life-long annuity.” (Trimmer v Van Bomel, 107 Misc 2d 201, 213, affd 82 AD2d 1023, lv denied 55 NY2d 602.)
CONSTRUCTIVE TRUST
It was open, of course for defendant, even if not contractually bound, to share her good fortune and shower her bounty upon plaintiff. Without consideration, and without any performance, she could designate plaintiff as the recipient of a gift or the beneficiary of a trust, provided the words or acts are unequivocal and that the only interpretation is that the property is to be held in trust. (Blanco v Velez, 295 NY 224; Matter of Fontanella, 33 *233 AD2d 29, 30.) She could do so unconditionally, or she could require that it would occur only upon the happening of a specified condition. A donor may agree to bestow money on a nephew if he gives up smoking (Homer v Sidway, 124 NY 538, 550), or give money if a child marries as the father wishes. (Sarasohn v Kamaiky, 193 NY 203.) Conditional gifts, like contractual conditions precedent, require the occurrence of the conditional event, whether within the donee’s control or not. The underlying question always is the matter of donative intent.
Thus, in Mizrahi v Mizrahi (57 Misc 2d 1021), an action was brought to impress a trust on the proceeds of a winning State lottery ticket. There it was held that the circumstances of the case compelled the conclusion that the ticket purchaser intended his wife and two sons to share the prize equally if any of his tickets won, and that given his donative intent, a constructive trust would be declared on the proceeds.
In this case there was no close or confidential relationship between the parties which would call for the imposition of a trust, nor would defendant be unjustly enriched if she retained the full proceeds of her winning ticket. No basis is demonstrated for the establishment of a constructive trust, or the declaration of a trust ex maleficio.
For the reasons above stated, the plaintiff has no legally enforceable claim on the proceeds of the winning ticket, and defendant’s motion for summary judgment dismissing the complaint is granted. In view of this disposition, plaintiff’s discovery motion and defendant’s cross motion for leave to serve an amended answer are deemed moot.

 In attempting to ascertain the identity of “St. Eleggua”, the closest the court could come in its research was a saint with the Latin name of St. Eligius (immortalized on television as St. Elsewhere), the patron saint of goldsmiths, who before his canonization served under French kings in the 7th Century as master of the mint, and who showered his riches on the poor who turned to him in overwhelming numbers. He possessed the gifts of miracles and prophecy, and is reputed to have broken open the chains of prisoners by his prayers. (2 A Dictionary of Christian Biography 93 [1967]; Butler, Lives of the Saints, rev ed of 4 Thurston & Attwater, at 455-458.) No wonder defendant sought to invoke his aid as the means to overwhelming riches!