Brian T. OLSON, Plaintiff,

v.

O. Andreas HALVORSEN, David C. Ott, Viking Global Investors LP, Viking Global Partners LLC, Viking Global Performance LLC, and Viking Global Founders LLC, Defendants.

Viking Global Performance LLC, Daniel Cahill and Thomas Purcell, Defendant–Counterclaim Plaintiff and Third–Party Plaintiffs,

v.

Brian T. Olson, Plaintiff–Counterclaim Defendant and Third–Party Defendant–Counterclaimant.

C.A. No. 1884–VCL.

Court of Chancery of Delaware.

Submitted: Oct. 6, 2008.
Decided: Oct. 22, 2008.

Collins J. Seitz, Jr., Esquire, Meredith L. Gaudio, Esquire, Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware; R. Scott Garley, Esquire, Jeffrey L. Nagel, Esquire, Mark W. Stoutenburg, Esquire, GIBBONS P.C., New York, NY, Attorneys for the Plaintiff, Counterclaim–Defendant and Third–Party Defendant–Counterclaimant, Brian T. Olson.

Martin P. Tully, Esquire, Jon E. Abramczyk, Esquire, John P. DiTomo, Esquire, Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, Delaware; Bruce Birenboim, Esquire, Susanna Buergel, Esquire, Paul, Weiss Rifkind, Wharton & Garrison LLP, New York, NY, Attorneys for Defendants and Counterclaim Plaintiffs.

## OPINION AND ORDER

LAMB, Vice Chancellor.

This case arises from a dispute among the founders of a hedge fund regarding the appropriate amount owed to one of the founders upon his removal from the company. The LLC operating agreement that the removed founder relies upon in the contract claim of his lawsuit is unsigned. The unsigned operating agreement provides that upon leaving the company a founder is entitled to a multi-year earnout, in this case purportedly worth over $100 million. In contrast, relevant signed documents provide that a founder is only entitled to his capital account and compensation owed upon leaving the company.

Due to the multi-year payment structure of the earnout and various restrictions imposed over that time period by the unsigned operating agreement, the one-year provision of the statute of frauds is potentially implicated. The primary issue before the court, and a matter of first impression, is whether the Delaware statute of frauds applies to LLC operating agreements. At the summary judgment hearing in this case, the court asked the defendants to provide any additional authority for their contention that the statute of frauds applied to LLC operating agreements. The court later asked the plaintiff to respond to the defendants' submission.

Upon examination of the materials submitted by the parties—none of which included case law directly on point—and upon further consideration, the court finds, as a matter of law, that the statute of frauds applies to LLC operating agreements. Additionally, the court holds that the exceptions to the statute of frauds argued by the plaintiff do not apply in this case to save the principal provision at issue.

## I.

### A. *The Parties*

The plaintiff in this action is Brian Olson, a founder of the investment management and hedge fund firm known as Viking Global.

The defendants are Olson's former partners and the two other founders of Viking Global, Andreas Halvorsen and David Ott, and various entities through which Viking Global conducted its business. The entities are Viking Global Investors LP, a Delaware limited partnership ("Investors");[1] Viking Global Partners LLC, a Delaware limited liability company ("Partners");[2] Viking Global Performance LLC, a Delaware limited liability company ("Performance");[3] and Viking Global Founders LLC, a Delaware limited liability company ("Founders").[4]

### B. *Facts*

Beginning in February 1999, Halvorsen, Ott, and Olson, all three previously colleagues at the hedge fund Tiger Management, began taking steps towards forming the Viking entities. Halvorsen, Ott, and Olson orally agreed that the three of them would form the operating committee of Viking, which would be authorized to act upon a two-thirds vote, subject to a Halvorsen veto. Halvorsen would receive 55% of the profits from Viking, and Ott and Olson would each receive 22.5%. On October 1, 1999, Halvorsen, Ott, and Olson launched the two initial Viking hedge funds: Viking Global Equities LP (for onshore funds) and Viking Global Equities III Ltd. (for offshore funds).

Between April and September 1999, Viking formed Performance to receive the hedge funds' performance fee, Investors to receive the hedge funds' management fee, and Partners to be the general partner of Investors.[5] Short-form operating agreements were signed for Investors, Partners, and Performance. The long-form operating agreements for Investors and Partners were drafted but never signed. The long-form operating agreement for Performance was originally dated as of September 28, 1999, but not executed until it was amended and restated on January 11, 2002. The draft long-form operating agreements for Investors and Partners and the signed agreement for Performance state that if a partner or member leaves Viking he is only entitled to his capital account balance and compensation owed.

Founders was formed as a Delaware limited liability company on or about Sep-

---

1. Prior to Olson's termination, the limited partners of Investors were Halvorsen, Ott, Olson, and Founders. The general partner of Investors was Partners.

2. Prior to Olson's termination, the members of Partners were Halvorsen, Ott, and Olson.

3. Prior to Olson's termination, the members of Performance were Halvorsen, Ott, Olson, Founders, and certain employees of Viking.

4. Prior to Olson's termination, the members of Founders were Halvorsen, Ott, and Olson.

5. Olson was put in charge of dealing with Viking's attorneys and dealing with the documents related to the formation and operation of these entities.

tember 28, 1999. The Founders unsigned, draft long-form document contains an earnout provision not found in any of the other operating agreements.[6] According to its terms, any of the three founders who voluntarily or involuntarily retire from Viking would be entitled to a multi-year earnout of his interest in Viking upon leaving the company. The parties dispute whether they ever reached an agreement on the terms of the unsigned Founders operating agreement.[7]

In March 2005, Olson decided to take a sabbatical from Viking for six months to travel with his family. When Olson returned, Halvorsen and Ott called a meeting on August 29, 2005 to notify Olson of their decision to remove him from his position at Viking. Halvorsen and Ott paid Olson over $100 million, which represented Olson's capital account balance and the remainder of his 2005 salary. Halvorsen, Ott, and Viking have refused Olson's demand for an earnout, claiming that they never agreed to it.

On January 12, 2006, Olson filed suit in this court seeking, among other things, to collect the series of six yearly payments he says he is entitled to under the earnout provision of the unsigned Founders operating agreement. Viking answered the complaint on March 17, 2006. On February 1, 2008, Olson amended his complaint.[8] In response, on February 28, 2008, Viking amended its answer and added counterclaims.[9] On June 5, 2008, Viking filed a motion for summary judgment and, on July 18, 2008 Olson filed a cross-motion for summary judgment. The parties filed briefs in support of the motions for summary judgment in July and August 2008, and on September 8, 2008, the court heard oral arguments. At the hearing, the court orally denied the cross-motions for summary judgment in some respects, and asked that the defendants provide additional authority for their argument that the statute of frauds should apply to an oral LLC operating agreement. On September 12, 2008, defendants provided the court with a letter citing secondary sources, but no case law directly on point.

6. The earnout provision generally provides that a member of Founders would be entitled to a percentage of Founders's income over the six years following retirement. The percentage would be the product of the member's final profit percentage interest (in Olson's case, 22.5%) and a set percentage that declined from 100% to 44.37% over the course of the six years. The unsigned Founders operating agreement also requires the non-retiring members to adjust the profit percentage of the retiring member so as to maintain his economic interest. In addition, the agreement prevents the non-retiring members from taking "any action that would reduce a retired Member's economic interest." *See* § 5.03(b)(iv). Moreover, the unsigned Founders operating agreement prevents Halvorsen, as long as he maintains his veto rights, from withdrawing funds that would cause his investment to be less than 89.27% of the amount he invested on October 1, 1999. The agreement also requires that Olson and Ott give 45–days prior written notice for a with-

drawal that would cause the withdrawing party's investment to be less than 89.27% of the amount he invested on October 1, 1999.

7. No short-form agreement regarding the operation of Founders was ever drafted.

8. The amended complaint sets forth eight claims: (1) breach of contract, (2) breach of fiduciary duty, (3) civil conspiracy, (4) right to fair value and interest in Viking pursuant to 6 *Del. C.* § 18–604 and 6 *Del. C.* § 17–604, (5) unjust enrichment, (6) accounting, (7) equitable estoppel, and (8) promissory estoppel.

9. The counterclaims are brought by third-party claimants who were non-founding members of Performance. The counterclaims include claims against Olson for breach of fiduciary duty, breach of contract, and breach of the implied covenant of good faith and fair dealing for drafting and seeking to enforce the unsigned Founders operating agreement.

On October 6, 2008, Olson replied that his research also failed to reveal any case law on point and generally reiterated portions of his argument that the statute of frauds does not apply in this case.

This opinion focuses on the purely legal question of whether the statute of frauds applies to LLC operating agreements. As set forth below, the court finds that the statute of frauds applies and the exceptions argued by Olson are not available under the facts of this case. Therefore, the defendants' motion for summary judgment as to Olson's breach of contract claim will be granted.

## II.

 In cross-motions for summary judgment, each moving party "must show that there is 'no genuine issue as to any material fact' and that [it] is 'entitled to judgment as a matter of law'" in order to prevail.[10] "In deciding a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party."[11] "Summary judgment will not be granted when the record reasonably indicates that a material fact is in dispute or 'if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.'"[12] Here, the material disagreements between the parties lie not in issues of fact, but in issues of law.

## III.

A. *Applicability Of The Statute Of Frauds To LLC Operating Agreements*

The initial issue before the court is whether the statute of frauds applies to an LLC operating agreement under Delaware law.[13]

The Delaware LLC statute expressly allows oral operating agreements, but does not address whether the statute of frauds would apply to such agreements.[14] There is disagreement among commentators as to whether the statute of frauds applies to Delaware LLC operating agreements, and there appears to be no case law (in Delaware or elsewhere) on the subject. Some commentators reason that without an express, specific indication of intent to override a statutorily enacted principle of contract law, such as the statute of frauds, the principle should apply.[15] Others argue that the stated policy of the Delaware

---

**10.** *Lillis v. AT & T Corp.*, 2006 WL 3860915, at *1 (Del.Ch. Dec. 21, 2006) (quoting Ct. Ch. R. 56(c) and citing *Acro Extrusion Corp. v. Cunningham*, 810 A.2d 345, 347 (Del.2002) and *Williams v. Geier*, 671 A.2d 1368, 1375 (Del.1996)).

**11.** *Id.* at *1 (citing *Tanzer v. Int'l Gen. Indus., Inc.*, 402 A.2d 382, 385 (Del.Ch.1979)).

**12.** *Id.* at *1 (quoting *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del.1962)).

**13.** The issue appears to be one of first impression. Neither party could point to any case, in any jurisdiction, discussing whether the statute of frauds applies in an LLC context.

**14.** 6 *Del. C.* § 18–101(7) reads: "'Limited liability company agreement' means any agreement (whether referred to as a limited liability company agreement, operating agreement or otherwise), written, oral or implied, of the member or members as to the affairs of a limited liability company and the conduct of its business."

**15.** Discussing the Delaware LLC statute, one commentator writes: "Probably, the writing requirement [of the statute of frauds] applies to the LLC agreement as well. The definition of limited liability company agreement includes written or oral agreements, but nothing in the definition suggests an intent to override the statute of frauds." CARTER G. BISHOP & DANIEL S. KLEINBERGER, LIMITED LIABILITY COMPANIES: TAX AND BUSINESS LAW § 14.03 (2008).

LLC act is "to give maximum effect ... to the enforceability of limited liability companies," which, along with the authorization of oral operating agreements, creates an inference that the legislature intended to override the statute of frauds.[16]

The Delaware statute of frauds states that an agreement "that is not to be performed within the space of one year from the making thereof" must be reduced to writing and signed by the party against which the agreement is to be enforced.[17] It is long-standing Delaware law that "the Statute of Frauds does not apply to a contract which may, by any possibility, be performed within a year."[18] Few oral LLC operating agreements are likely to contain any term or provision that cannot possibly be performed within one year. To that extent, the statute of frauds will not limit the enforcement of any such agreement.

■ This court holds that if an LLC agreement contains a provision or multiple provisions which cannot possibly be performed within one year, such provision or provisions are unenforceable. The basis for this decision is in line with the policy for the enactment of the statute of frauds—to protect defendants against unfounded or fraudulent claims that would require performance over an extended period of time.[19] However, in keeping with the legislature's expressed intent "to give maximum effect ... to the enforceability of limited liability companies," provisions of an oral LLC operating agreement that could possibly be performed within one year will not fall within the statute of frauds and will remain enforceable.[20]

## B. Is The Obligation To Make Retirement Payments One That May Possibly Be Performed Within One Year?

■ Olson argues that the unsigned Founders operating agreement does not fall within the statute of frauds because the *obligation* to make payment under the earnout provision of the agreement could occur within one year. For example, Olson points out that he could have been fired less than one year from the founding of Viking, triggering Viking's obligations under the earnout provision of the unsigned Founders operating agreement.[21] In that case, Olson argues, the calculation and payment of his interest in the period extending beyond one year would not be enough to violate the statute of frauds. In support of his position, Olson cites two New York trial court cases and a 76–year old Delaware Supreme Court case.[22] One case involves a lottery winnings payout over ten years, one involves payment over time for the assignment of patent rights, and one involves payment of an employee

16. See ROBERT L. SYMONDS, JR. & MATTHEW J. O'TOOLE, SYMONDS & O'TOOLE ON DELAWARE LIMITED LIABILITY COMPANIES § 4.02 (2007) (quoting 6 *Del. C.* § 18–1101(b)).

17. 6 *Del. C.* § 2714(a).

18. *Haveg Corp. v. Guyer*, 211 A.2d 910, 912 (Del.1965).

19. See 9 WILLISTON ON CONTRACTS § 21:1 (4th ed.).

20. 6 *Del. C.* § 18–1101(b).

21. Viking contends that Olson's argument that Halvorsen and Ott would have owed him tens of millions of dollars under the earnout provision after less than one year of work shows that no rational business person would have agreed to such an earnout.

22. *Pando by Pando v. Fernandez*, 127 Misc.2d 224, 227, 485 N.Y.S.2d 162 (Sup.1984); *see also John William Costello Assocs., Inc. v. Standard Metals Corp.*, 121 Misc.2d 282, 284–85, 465 N.Y.S.2d 382 (Sup.1982); *Emerson v. Universal Prods. Co.*, 162 A. 779, 781 (Del. 1932).

placement fee. These cases provide no support for Olson's position.

In both the patent case and the lottery case, the court expressly stated that *nothing* remained to be done after one year *except* payment of money.[23] Here, in addition to the payment of money, it is undisputed that the unsigned Founders operating agreement also requires the remaining members *to act to maintain the retired member's economic interest*, prevents the remaining members from taking actions to reduce the retired member's economic interest, and prevents Halvorsen from withdrawing a certain percentage of his funds unless he relinquishes his veto rights, all for a period of time well beyond one year. These obligations and restrictions affect how Halvorsen and Ott choose to run and structure their business over a multi-year period and rise above the mere payment of money over time. Moreover, most of the payments Halvorsen and Ott would be required to make under the earnout provision could not be calculated until more than one year after an event occurs triggering the alleged payment obligation.

In *John William Costello Associates v. Standard Metals Corporation*, the employment placement fee case, an executive search consultant argued it was entitled to 30% of the first year compensation of the employee it introduced to the defendant.[24] The court held that calculating the search consultant's fee from the executive's base salary was a "ministerial act" and "became fixed when [the defendant] signed the employment contract with [the employee]." [25] The defendant argued that the employee's first year bonus could not be calculated within a year from the alleged oral agreement with the search consultant and thus the agreement was void under the statute of frauds. The court found that there was no assurance that the employee would be entitled to a bonus and therefore the employee's first year compensation and the search consultant's fee was capable of being calculated within one year. For example, the court noted that the employee could leave the defendant's company or die before the defendant awarded bonuses, thus allowing the agreement to be fully performed within one year.

In contrast, here, if a member of Founders dies after retirement, the obligations of the remaining members expressly continue for the benefit of the retired member's estate or successor-in-interest. The case before this court is more analogous to *Briefstein v. P.J. Rotondo Construction Company*, where the court found that the statute of frauds applied because the 25%

---

23. *Emerson*, 162 A. at 781 (stating that the one-year provision of the statute of frauds does not apply when "the agreement contemplates one party immediately, fully, and completely complying with his entire obligation and he does so immediately comply and there remains nothing to be done by the other but the payment of money[.]" The case did not discuss whether the amount owed over multiple years for the assignment of patent rights was immediately calculable or not.); *Pando*, 127 Misc.2d at 226, 485 N.Y.S.2d 162 (holding that there would be no violation of the statute of frauds if "all contingencies can occur, and all conditions precedent can be performed within the one year period, with nothing remaining to be done thereafter except the act of payment[.]" The court noted that

"[t]he fact that the [lottery] payout would be extended over several years is of no moment, for the liability, if any, was fixed, the amounts known, and all that remained was the ministerial act of having the annual payouts divided." As the court continues to explain, "[t]his is quite different from an agreement by a party to pay out a percentage of sales or earnings over a period of years, which may call for future services, and *where the amounts cannot be established until well into the future*." (emphasis added)).

24. *See* 121 Misc.2d at 283, 465 N.Y.S.2d 382.

25. *Id.* at 285, 465 N.Y.S.2d 382.

profit share at issue could not be calculated until after one year and extended indefinitely.[26] Here, all amounts except the first earnout payment cannot possibly be calculated until after one year following the alleged agreement. Additionally, as discussed above, there are substantive obligations and restrictions extending for multiple years would be placed on Halvorsen and Ott by the unsigned Founders operating agreement. The statute of frauds provision requiring a signed writing for an agreement "that is not to be performed within the space of one year from the making thereof" is therefore applicable.[27]

## C. Exceptions To The Statute Of Frauds

### 1. Multiple Writings

 Olson argues that, even if the statute of frauds applies, the multiple writing exception removes the unsigned Founders operating agreement from the statute. Multiple writings will satisfy the statute of frauds if they "(a) reasonably identify the subject matter of the contract, (b) indicate that a contract has been made between the parties or an offer extended by the signing party and (c) state with reasonable certainty the essential terms of the unperformed promises in the contract."[28] Additionally, to fall within the multiple writings exception, at least one of the writings must be signed by the party against whom the documents are to be enforced.[29] In discussing the multiple writings exception to the statute of frauds, the notes to the Restatement (Second) of Contracts § 132 state that "the documents may be read together if in the circumstances they clearly relate to the same transaction and the party to be charged has acquiesced in the contents of the unsigned writing." Here, the documents Olson identifies do not clearly refer to either the unsigned Founders operating agreement or the earnout provision (§ 5.03) in that document that is at the heart of this dispute.

Olson notes that the parties signed a letter agreement on November 1, 2002 to govern any future liquidation of the Viking entities. The liquidation agreement references the "Limited Liability Company Agreement for VGFounders, as amended from time to time." This is potentially persuasive evidence if the liquidation agreement unambiguously references the unsigned Founders operating agreement. However, "Limited Liability Company Agreement" is a generic phrase and there is no additional information, such as a date or distinguishing terms, to aid in determining whether the liquidation agreement refers to the unsigned Founders long-form document or an oral operating agreement for Founders. In the cases Olson cites in support of his argument, the signed writing clearly identifies the unsigned document and suggests agreement by the parties to the unsigned document.[30]

26. See 8 A.D.2d 349, 350–51, 187 N.Y.S.2d 866 (A.D.1959).

27. 6 Del. C. § 2714(a).

28. See ROI, Inc. v. E.I. du Pont de Nemours & Co., Inc., 1989 WL 135717 at *5 (Del.Super.Oct.19, 1989) (citing Restatement (Second) of Contracts § 131); Kirschling v. Lake Forest Sch. Dist., 687 F.Supp. 927, 931 (D.Del.1988).

29. See ROI, Inc., 1989 WL 135717 at *5.

30. See Suchin v. Frederick, 30 A.D.3d 503, 503–04, 817 N.Y.S.2d 351 (2d Dept. 2006). In Suchin, the signed basement construction agreement referred to the construction and sale of a house at a specific address. In addition, unlike the case here, the defendant admitted he intended to sign the construction and sale agreement at the same time he signed the basement construction agreement. See also Pennzoil Co. v. Getty Oil Co., 1984 WL 15664 (Del.Ch. Feb. 6, 1984) (holding that a press release citing exact terms of an

In addition, Olson lists a number of other documents. such as tax returns and annual statements, that reference Founders. However, these documents do not appear to reference any of the terms of the unsigned Founders operating agreement or, in particular, the earnout provision, which potentially subjects the members of Founders to hundreds of millions of dollars in liability over multiple years.[31] Without a clear and specific reference in a signed writing to the unsigned Founders operating agreement containing the earnout provision, there is insufficient evidence to bring the Founders operating agreement under the umbrella of the multiple writings exception.

The other documents cited by Olson fail to lay out *any* of the terms of the earnout provision, much less the essential terms of the agreement which are required to satisfy the multiple writings exception.

### 2. *Part Performance*

■ Olson asserts that the unsigned Founders operating agreement falls within the part performance exception to the statute of frauds. However, the part performance exception is not applicable in this case. The majority of jurisdictions follow the rule that "[e]xcept in contracts for the sale of land, an agreement not performable within a year is generally not validated by part performance."[32] The Delaware Superior Court upheld the general rule, stating:

> The purpose of the Statute of Frauds is to prevent frauds that may occur if oral contracts were permitted . . . . "This purpose would be undermined if a party's conduct could form the basis for establishing and enforcing a claimed oral agreement not to be performed within one year simply because the same party's conduct arguably provided the only explanation for the agreement. Such an approach would invite persons to concoct and seek enforcement of fictitious contracts on grounds that the existence of an agreement would provide the only possible explanation for such persons' conduct. *In contrast to real estate contracts*, where evidence of part performance is relatively clear, definite, and substantial, the nature of evidentiary facts potentially asserted to show part performance of an agreement not performable within one year would be vague, subjective, imprecise, and susceptible to fraudulent application."[33]

unsigned memorandum brought the unsigned memorandum into the multiple writings exception of the statute of frauds). Both cases cite *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551 (1953), which states that "it is hardly possible that such detailed information could refer to another or different agreement" as justification for finding agreement to an unsigned document. *Id.* at 554–55. Here, it is entirely possible the reference to "Limited Liability Company Agreement for VGFounders" refers to an agreement other than the Founders long-form document, including potentially an oral operating agreement without an earnout provision.

31. Additionally, Olson has not produced writings outside of the unsigned Founders operat-

ing agreement that evidence Halvorsen's and Ott's agreement to the earnout provision. In fact, Viking has produced evidence suggesting that Halvorsen and Ott did not agree to the earnout.

32. 10 WILLISTON ON CONTRACTS § 28:9 (2008). Both cases cited by Olson in support of his part performance argument involve real estate related agreements. *See Quillen v. Sayers*, 482 A.2d 744 (Del.1984); *Shepherd v. Mazzetti*, 545 A.2d 621 (Del.1988).

33. *Aurigemma v. New Castle Care LLC*, 2006 WL 2441978, *3 (Del.Super.Aug.22, 2006) (emphasis added) (quoting *Coca–Cola Co. v. Babyback's Int'l, Inc.*, 841 N.E.2d 557, 567 (Ind.2006)).

The same case explicitly states that "Delaware law is clear that the part performance doctrine does not apply to oral contracts not to be performed within one year."[34] Therefore, the part performance exception is not available to Olson and the unsigned Founders agreement violates the one year provision of the statute of frauds.

## IV.

For the reasons set forth above, summary judgment in favor of the defendants, as to the plaintiff's claim in contract, is GRANTED. The court's ruling on the remaining claims and counterclaims is set forth in the record of the September 8, 2008 hearing. IT IS SO ORDERED.

---

34. *Id. See also Behr Salyard & Partners, L.P. v. Leach,* 1992 WL 172615 (E.D.Pa. July 9, 1992) (applying Delaware law and holding that "partial performance of services under an oral contract not to be performed within a year does not remove the contract from the operation of the Statute of Frauds" (internal quotations and citations omitted)); *In re Flying W. Airways, Inc.,* 341 F.Supp. 26, 73 (E.D.Pa.1972) (applying Delaware law and holding that "the partial performance exception is not available to the 'not to be per-formed within one year' portion of the statute" in considering an aircraft refinancing agreement); *Hull v. Brandywine Fibre Products Co.,* 121 F.Supp. 108, 114 (D.Del.1954) ("It is equally uncontroverted that partial performance of services under an oral contract not to be performed within a year does not remove the contract from the operation of the Statute of Frauds.").