Brian T. OLSON, Plaintiff
Below, Appellant,

v.

O. Andreas HALVORSEN, David C. Ott,
Viking Global Investors LP, Viking
Global Partners LLC, Viking Global
Performance LLC, and Viking Global
Founders LLC, Defendant Below, Ap-
pellee.

No. 338, 2009.

Supreme Court of Delaware.

Submitted: Oct. 28, 2009.
Decided: Dec. 15, 2009.

Collins J. Seitz, Jr. and Bradley R. Aronstam of Connolly Bove Lodge & Hutz, LLP, Wilmington, DE; David C. Frederick (argued), Scott H. Angstreich and Scott K. Attaway of Kellog, Huber, Hansen, Todd, Evans & Figel, PLLC, Washington, DC, for appellant.

Jon E. Abramczyk and John P. DiTomo of Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, DE; Andrew L. Frey (argued), Charles A. Rothfeld, Andrew H. Schapiro and Hannah Y.S. Chanoine of Mayer Brown, LLP, New York City, for appellee.

Before STEELE, Chief Justice, HOLLAND, and JACOBS, Justices.

STEELE, Chief Justice:

Brian Olson, the plaintiff below appellant, claims that his investing partners orally amended their LLC's compensation provisions. The Vice Chancellor held that Olson failed to prove an amendment, and that the statute of frauds applies to LLC operating agreements, making the alleged oral amendment nonenforceable. Olson asserts that applying the statute of frauds to LLC agreements contravenes the General Assembly's intent to give LLC agreements maximum effect. Because the trial court committed no legal error and the record supports the Vice Chancellor's contractual interpretation, we **AFFIRM**.

## FACTS AND PROCEDURAL HISTORY

Andreas Halvorsen, David Ott, and Olson worked together at Tiger Management, a hedge fund. In early 1999, Halvorsen left Tiger Management and contacted Olson and Ott about forming a new hedge fund, Viking Global.

### I. The February 1999 Meeting and the "Cap and Comp" Agreement

In February 1999, Halvorsen, Olson, and Ott orally agreed upon Viking's fundamental operating terms. They agreed that the three founders would operate Viking, and divide all of its profits annually. If any

one of them left Viking, he would receive only his capital account balance and earned compensation.[1]

## II. Formation of the Viking Entities

To carry on the Viking business, the founders created three Delaware entities: (1) Viking Global Performance LLC to collect Viking's performance fees; (2) Viking Global Investors LP to pay Viking's expenses, employ Viking's staff, enter into operational contracts on Viking's behalf, and collect management fees; and (3) Viking Global Partners LLC to serve as the general partner for Investors. They executed certificates of formation on April 8, 1999, and filed them with the Secretary of State of Delaware the next day.

## III. Operating Agreements for the Viking Entities

Olson directed Viking's counsel to draft operating agreements for the Viking entities. In April 1999, Viking's counsel provided the first drafts of the operating agreements for Investors, Partners, and Performance. These long-form operating agreements reflected the founders' earlier oral agreements.

Viking's counsel, at Olson's direction, also drafted short-form operating agreements for Investors, Partners, and Performance.[2] After Olson requested, and counsel made, a few modifications, the three founders signed all three short-form agreements.[3] The short-form operating

---

1. Halvorsen, Olson, and Ott forfeited large sums of money after resigning from Tiger Management because of its deferred compensation system. They decided that Viking would pay out all the profits annually to avoid the perceived unfairness of Tiger Management's deferred compensation system. Halvorsen, Olson, and Ott all testified that they agreed to this "cap and comp" agreement.

2. Counsel drafted short-form operating agreements because, in April 1999, counsel was refining the long-form operating agreements and the Viking entities needed operating agreements to enter into a real estate lease and open bank accounts. Counsel specifically drafted the short-form operating agreements consistent with the core principles of Viking.

3. The founders executed the short-form operating agreements for Investors and Partners

agreements do not contain all of the terms agreed upon by the founders at the February meeting, but each short-form agreement does provide that a departing member will receive only his capital account balance and accrued compensation.

After the founders executed the short-form agreements, Olson and Viking's attorneys continued to refine the long-form agreements. They produced more than a dozen drafts between April 1999 and October 1, 1999 when Viking was launched. As a result of a potential dispute with an employee, the founders decided to supersede the Performance short-form agreement, by signing the Performance long-form agreement, dated September 28, 1999. The founders never signed long-form operating agreements for Investors and Partners, however, the unsigned Investors and Partners long-form agreements, and the signed Performance long-form agreement all provide that a departing member of Viking will receive only his capital account balance and accrued compensation.

## IV. Founders and the Earnout Provision

In mid–1999, Olson proposed that a new entity, Viking Global Founders LLC, pay a founder an earnout upon his departure from Viking. Olson did not explain the details of the earnout at the founders' first meeting, but Halvorsen and Ott considered the idea interesting, and the three founders left the issue open for discussion.[4]

Olson continued to direct Viking's attorneys, who prepared nine drafts of the

Founders operating agreement over roughly a year and a half. The draft agreement provided that each founder would receive a declining percentage of his interest in Viking for six years upon retirement or death (the earnout provision). During the drafting process, Olson never discussed changes to the Founders agreement.[5] Between 1999 and 2001, Halvorsen and Ott received several drafts of the Founders agreement, but Halvorsen and Ott never discussed the drafts or the earnout concept with Olson after meeting briefly in the summer of 1999. None of the three founders ever signed a Founders operating agreement, and Halvorsen and Ott testified that they never reached an agreement with, or made promises to, Olson regarding the Founders earnout concept.

Outside counsel, at Olson's direction, filed a certificate of formation for Founders on September 28, 1999. Olson also instructed Founders to become a member of Performance, and directed certain portions of the founders' year 2000 to 2005 residual income through Founders.

## V. Renegotiation of Compensation Percentages

By the end of 2001, when Olson's compensation dissatisfied him, Halvorsen refused to pay him more, and Olson announced his exit from Viking. Halvorsen and Olson decided to negotiate a mutually acceptable solution that decreased Halvorsen's share and increased Olson's share of Viking profits.

---

on May 10, 1999, and the short-form operating agreement for Performance on September 8, 1999.

4. Olson testified that a month or two later the three founders held a second meeting to discuss the earnout concept, where he distributed a term sheet to Halvorsen and Ott about

that provision. Halvorsen and Ott both testified that they had never seen this term sheet before litigation.

5. Many of these changes differed significantly from the term sheet Olson claims he showed Halvorsen and Ott.

Olson admitted that the three founders did not discuss how the changes in compensation percentages would affect the earnout provision he claims was agreed to or their purported entitlement to the fair value of Founders. Halvorsen and Ott thought that these changes would only affect annual compensation. Both Halvorsen and Ott testified that they would never have agreed to increase Olson's retirement benefits without requiring him to stay at Viking for a substantial period of time. Otherwise, Olson could have immediately walked away with a substantial amount of additional money, without conveying any corresponding additional benefit for Viking.

## VI. The Liquidation Agreement

On November 1, 2002, Halvorsen, Olson, and Ott signed a letter agreement to govern any future liquidation of the Viking entities. The liquidation agreement references the "Limited Liability Company Agreement for VGFounders, as amended from time to time." The founders did not discuss the Founders agreement for another two years.

## VII. The Founders Agreement and Earnout Resurface

Daniel Cahill, who became Viking's president in 2003, discovered the draft Founders agreement in the summer of 2004. The earnout provision surprised him, because the founders had told him on several occasions that employees would only get paid while they were actively employed at Viking. Cahill also testified that Olson had told him several times that a departing Viking founder could only receive his capital account balance and accrued compensation. Cahill met with Halvorsen, Olson, and Ott, all of whom told Cahill that they had not reached an agreement regarding an earnout.[6]

From July 2004 until November 2004, Cahill listed Founders on meeting agendas, so the management committee could resolve open questions about Founders. Olson received the agendas and attended most of the meetings, but never raised any questions regarding Founders and never claimed that Halvorsen, Ott, and he had agreed to the earnout provision in the Founders agreement.

## VIII. Olson's Personal Financial Statements

In 2003 and 2004, Olson prepared personal financial statements setting forth his net worth. As his interest in the Viking entities in 2003 and 2004, Olson listed the amount of his capital account balance, but did not list the value of the equity (either through a fair value analysis or an earnout concept) to which he now claims he is entitled. Olson represented his signed personal financial statement as both correct and complete.

## IX. Olson's Disappointment and Sabbatical

At the end of 2004, Olson expressed disappointment with his portfolio returns and his role at Viking. In March 2005, Olson informed Halvorsen, Ott, and Cahill of his decision to take a six month sabbatical. Olson mentioned that he might like to transition into another role at Viking, such as running a separately managed fund. Olson also told Cahill, however, that he might not return to Viking.

---

6. Brian Smith, Viking's Chief Financial Officer, also testified at trial that he believed the three founders never agreed to an earnout and that they had never finalized the Founders agreement.

## X. Viking Terminates Olson

Viking did not replace Olson instead, Viking shut down his portfolio, and Halvorsen instructed Cahill to determine what role Olson could play upon his return. Cahill, along with other members of Viking's management, concluded that a separate Olson operated fund would not best serve Viking and its investors. Cahill also concluded that Viking operated more efficiently without Olson.

After discussing Cahill's findings, the management committee unanimously determined that Viking had no place for Olson. At a meeting on August 29, 2005, Halvorsen and Ott informed Olson that he would not be returning to Viking after his sabbatical. Olson then asked about Founders for the first time in six years. Halvorsen told Olson that they had not given any thought to Founders. On his departure, Viking paid Olson over $100 million, representing his 2005 compensation and his capital accounts in each Viking entity.

## XI. Olson Sues Viking in the Court of Chancery

On January 12, 2006, Olson filed suit in the Court of Chancery seeking, among other things, to collect the multi-year earnout he claims Viking owes him under the unsigned Founders operating agreement. Olson asserted the following claims: (1) breach of contract; (2) breach of fiduciary duty; (3) civil conspiracy; (4) right to fair value and interest in the Viking entities

pursuant to 6 *Del. C.* § 18–604 and 6 *Del. C.* § 17–604; (5) unjust enrichment; (6) accounting; (7) equitable estoppel; and (8) promissory estoppel.

## XII. Summary Judgment in Favor of Viking on the Contract Claim

The parties filed cross motions for summary judgment. On October 22, 2008, the Vice Chancellor granted Viking summary judgment on Olson's breach of contract claim.

The Vice Chancellor first found that the statute of frauds applies to LLC operating agreements. The Delaware statute of frauds states that parties must reduce to writing, and the defending party must have signed, any agreement that cannot be completed within one year from its making.[7] The Vice Chancellor held that the statute of frauds prevents enforcement of oral LLC agreements that require more than one year to complete.[8]

Second, the Vice Chancellor found that "all amounts except the first earnout payment cannot possibly be calculated until after one year following the alleged agreement" and that "substantive obligations and restrictions extending for multiple years would be placed on [Halvorsen] and Ott by the unsigned Founders operating agreement."[9] Thus, the Vice Chancellor concluded that the earnout provision in the unsigned Founders operating agreement fell within the statute of frauds and, thus, was unenforceable.

---

7. 6 *Del. C.* § 2714(a).

8. The Vice Chancellor omitted the word "oral," where he states that "if an LLC agreement contains a provision or multiple provisions which cannot possibly be performed within one year, such provision or provisions are unenforceable." *Olson v. Halvorsen*, 982 A.2d 286, 2008 WL 6745401, at *3 (Del.Ch. Oct. 22, 2008). This holding, read literally, prevents enforcement of any LLC agreement that requires more than one year to perform, even if in writing and signed. We expect that the Vice Chancellor mistakenly omitted the word "oral," because his discussion otherwise comports with ours.

9. *Olson*, 982 A.2d 286, 2008 WL 6745401, at *5.

Third, the Vice Chancellor determined that Olson did not satisfy the multiple-writings exception to the statute of frauds. The Vice Chancellor found that the liquidation agreement did not unambiguously reference the unsigned Founders operating agreement.[10] The Vice Chancellor further found that none of the documents Olson identifies clearly refer to either the unsigned Founders operating agreement or the earnout provision. The Vice Chancellor concluded that "[w]ithout a clear and specific reference in a signed writing to the unsigned Founders operating agreement containing the earnout provision, there is insufficient evidence to bring the Founders operating agreement under the umbrella of the multiple writings exception."[11] Thus, the Vice Chancellor held that the unsigned Founders agreement violates the one-year rule of the statute of frauds and granted summary judgment in favor of Viking on Olson's breach of contract claim.

### XIII. Olson Limited to His "Cap and Comp"

Thereafter, the parties submitted pre-trial briefs and the Vice Chancellor held a six-day trial on Olson's remaining claims in November and December 2008. The parties submitted post-trial briefs and engaged in post-trial argument on February 17, 2009. At trial and in his briefs, Olson focused on his purported entitlement to fair value for his interest in the Viking entities. Viking proved, and Olson admitted, that the Viking founders had agreed that a departing founder would receive only his capital account balance and accrued compensation.[12] The Vice Chancellor found that Olson did not prove that any other agreement superseded the "cap and comp" agreement. Rather, the Vice Chancellor held that "[w]hile there is virtually no evidence, outside of Olson's own testimony, that the founders intended to depart from the 'cap and comp' agreement, there is substantial evidence that Viking continued to act in conformity with the 'cap and comp' agreement before and after the formation of Founders."[13] Thus, the Vice Chancellor concluded that Olson could not collect the fair value of his ownership interest in any of the Viking entities, but only his capital account balance and accrued compensation.[14]

### XIV. Olson Appeals

On appeal, Olson argues that we must remand his (1) breach-of-contract and (2) fair-value claims, both of which the Court of Chancery erroneously rejected. Olson asserts that the Vice Chancellor erred by granting Viking's motion for summary judgment on Olson's contract claim, because (1) the statute of frauds does not apply to LLC operating agreements and, (2) even if it does, Olson satisfied the multiple-writings exception to the statute of frauds. Olson claims that, under the Founders operating agreement earnout provision, Viking must pay him a multi-

---

**10.** The Vice Chancellor stated that " 'Limited Liability Company Agreement' is a generic phrase and there is no additional information, such as a date or distinguishing terms, to aid in determining whether the liquidation agreement refers to the unsigned Founders long-form document or an oral operating agreement for Founders." *Id.*

**11.** *Id.* at *6.

**12.** The Vice Chancellor stated that the statute of frauds does not make the "cap and comp" agreement unenforceable, because it is possible that the "cap and comp" agreement could be completed within one year.

**13.** *Olson v. Halvorsen,* 2009 WL 1317148, at *9 (Del.Ch. May 13, 2009).

**14.** The Vice Chancellor found that Olson's other claims all failed as well.

year earnout of his interest in the enterprise, or, alternatively, pay him the fair value of his ownership.

## DISCUSSION

### I. Olson's Fair–Value and Breach–of–Contract Claims

Olson claims that the unsigned Founders operating agreement entitles him to an earnout, and that if we find that (1) the statute of frauds does not apply to LLC agreements or that (2) even if applicable the statute of frauds does not bar Olson's breach-of-contract claim, then we must remand for a trial on his contract claim, because the Vice Chancellor granted Viking summary judgment on that claim. Olson further contends that even if the founders did not agree to an equity earnout, Section 18–604 of the LLC Act and 6 *Del. C.* § 17–604 entitle him to the fair value of his interest in Viking.

Olson claims that the founders agreed to a distribution of their Viking equity shares, and that they formed Founders for that purpose. By granting summary judgment on the contract claim, Olson asserts the Vice Chancellor skewed the outcome of Olson's fair-value claim, because that ruling precluded "evidence that went 'to the very heart of [Olson's] case and might well have affected the outcome of the trial.' "[15] Thus, Olson urges, we must remand his fair-value claim.

After the Vice Chancellor granted summary judgment in favor of Viking on Olson's contract claim, the trial court held a six-day trial on Olson's remaining claims. The Vice Chancellor found that no other agreement superseded the founders' "cap

and comp" agreement, and therefore, Olson is entitled to payment under only that provision.

We review the Vice Chancellor's factual findings following a bench trial for clear error.[16] "When the factual findings are based on determinations regarding the credibility of witnesses, the deference already required by the clearly erroneous standard of appellate review is enhanced."[17]

### A. Olson's Fair–Value Claim

Olson contends that Viking owes him the fair value of his equity interest, and that we must remand this fair value claim for a new trial. Under Section 18–604 of the Delaware LLC Act, a resigning member of an LLC "is entitled to receive ... the fair value of such member's limited liability company interest," unless the LLC agreement provides otherwise.[18] Under 6 *Del. C.* § 17–604, a withdrawing partner of a limited partnership "is entitled to receive ... the fair value of such partner's partnership interest," unless the partnership agreement provides otherwise. Olson admits that the founders originally agreed that a departing member would only receive his "cap and comp." Thus, for Olson to succeed on his fair-value claim, he had to prove that the founders amended their original "cap and comp" agreement.

The Vice Chancellor found that the founders never superseded the original "cap and comp" agreement. The evidence substantially supporting this finding includes that the founders agreed on the "cap and comp" principle because of their

**15.** *Barrow v. Abramowicz,* 931 A.2d 424, 429 (Del.2007).

**16.** *Homestore, Inc. v. Tafeen,* 888 A.2d 204, 217 (Del.2005)

**17.** *Cede & Co. v. Technicolor, Inc.,* 758 A.2d 485, 491 (Del.2000).

**18.** 6 *Del. C.* § 18–604.

experience at Tiger; all the long-form and short-form operating agreements adhere to the "cap and comp" principle; the founders never signed the draft Founders agreement that contained the earnout provision; the founders did not discuss the earnout provision when they renegotiated their compensation percentages; Olson could have left Viking immediately after the renegotiation with a substantial amount of additional money, yet without obligation to confer any additional corresponding benefit to Viking; Olson told Cahill on several occasions that Viking's founders were only entitled to their "cap and comp" upon departing from Viking; all three Viking founders told Cahill that they never agreed to an earnout; no one discussed the Founders agreement or the earnout provision, even though Cahill listed Founders on the management committee meeting agendas for several months; Smith testified that he believed that the Viking founders never agreed to an earnout and or finalized the draft Founders operating agreement; Olson did not list on his 2003 and 2004 personal financial statements the value of the equity that he now claims to have in the Viking enterprise; and Olson did not bring up the alleged earnout until August 29, 2005, when Halvorsen and Ott told him that he could not return to Viking. Very little, if any, evidence—outside of Olson's testimony—indicates that Viking's founders departed from the "cap and comp" agreement.

Olson claims that, by granting summary judgment on Olson's contract claim, the Vice Chancellor prevented only consideration of the evidence supporting Olson's fair-value claim. Olson bases his argument on the fact that the Vice Chancellor's post-trial opinion does not discuss the liquidation agreement or the testimony related to it. Olson contends that the liquidation agreement, which the founders signed, evidences the founders' decision not to surrender their equity interests.

Granting summary judgment on Olson's contract claim did not affect the Vice Chancellor's consideration of Olson's fair-value claim. Nor did that ruling prevent Olson from introducing any evidence at trial. In fact, Olson attempted to prove, and the Vice Chancellor addressed in his post-trial opinion, the existence of an earnout or other equity-distribution scheme that departed from the parties' "cap and comp" agreement.

Although the Vice Chancellor did not discuss the liquidation agreement specifically in his post-trial opinion, that fact offers little, if any, support for Olson's claim that the founders agreed to an equity payout. The liquidation agreement merely refers to the operating committees and agreements.[19] The Vice Chancellor

---

19. Section 1(a) of the Liquidation Agreement, entitled "Liquidation Responsibilities," provides, in part, the following:

Upon the occurrence of a Liquidation Event (as defined below), the undersigned parties agree that all power and authority granted to (i) the operating committee of VGPerformance under the Limited Liability Company Agreement of VGPerformance, as amended from time to time, (ii) the operating committee of VGFounders under the Limited Liability Company Agreement of VGFounders, as amended from time to time, (iii) the operating committee of VGPartners under the Limited Liability Company Agreement of VGPartners, as amended from time to time, and (iv) the general partner of VGInvestors under the Limited Partnership Agreement of VGInvestors, as amended from time to time (collectively, the "Operating Agreements") and applicable law shall vest with you to the extent necessary to carry out the prompt and orderly winding-up liquidation and dissolution of the Viking Entities in accordance with the Operating Agreements, the governing documents applicable to the Affiliated

did not limit Olson's use of the liquidation agreement at trial. Therefore, we uphold the Vice Chancellor's findings that the Viking founders never departed from the original "cap and comp" agreement and that Viking does not owe Olson an equity payout. These findings were not clearly erroneous.

### B. Olson's Breach–of–Contract Claim

■ Olson also claims that Viking owes him a multi-year earnout under the earnout provision in the Founders agreement. Olson asserts that if (1) the statute of frauds does not apply to LLC agreements or (2) the statute of frauds does not bar Olson's breach-of-contract claim, then we must remand his contract claim for a new trial, because the Vice Chancellor erroneously disposed of Olson's contract claim on summary judgment. Olson is wrong even if we find that the Vice Chancellor ruled incorrectly on the statute of frauds issues, we need not remand Olson's contract claim, because the Vice Chancellor's statute of frauds rulings did not affect the outcome.

The Vice Chancellor rejected a necessary element of Olson's contract claim when he found, as fact, that the founders never superseded the original "cap and comp" agreement. To succeed on his contract claim, Olson would have to prove that Viking's founders agreed to depart from the original "cap and comp" agreement, and that they agreed to the earnout provision in the draft Founders agreement. Obviously, Olson cannot establish this element of his claim, because the Vice Chancellor has already found—with substantial

evidentiary support—to the contrary. The Vice Chancellor's factual ruling is not clearly wrong, for which reason we need not remand Olson's contract claim.

### II. The Statute of Frauds and LLC Agreements

Olson next claims that the Vice Chancellor's holding that the statute of frauds applies to LLC operating agreements, is irreconcilable with the Delaware LLC Act. Olson asserts that the policy and text of the Delaware LLC Act preclude the application of the statute of frauds to LLC operating agreements.

■ We must decide, as a matter of first impression, whether the statute of frauds applies to LLC agreements. We have often declined to decide an issue that does not affect a case's disposition, but this issue is one that could considerably impact the drafting and enforcement of LLC agreements. For this reason and because this issue involves a question of law and statutory construction, we proceed to review it *de novo*.[20]

■ The Delaware statute of frauds, which the General Assembly enacted over a century ago, bars the enforcement of an agreement "that is not to be performed within the space of one year from the making thereof," unless it is (1) written and (2) signed by the party against whom the agreement is to be enforced.[21] Only if the parties cannot possibly perform the agreement within one year does the statute of frauds apply and require a writing, signed by the charged party.[22]

Funds and applicable law (the "Liquidation Responsibilities").

**20.** *State v. Fletcher*, 974 A.2d 188, 192 (Del. 2009).

**21.** *6 Del. C.* § 2714(a).

**22.** *Haveg Corp. v. Guyer*, 211 A.2d 910, 912 (Del.1965).

█ The Delaware LLC Act seeks "to give maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."[23] To that end, the Delaware LLC Act allows "written, oral or implied" LLC agreements.[24] The Delaware LLC Act also provides that "[a] limited liability company is not required to execute its limited liability company agreement" and that "[a] limited liability company is bound by its limited liability company agreement whether or not the limited liability company executes the limited liability company agreement."[25] Thus, the Delaware LLC Act generally allows parties to enforce unwritten, unsigned LLC agreements.

 In this case, we must determine whether parties to a Delaware LLC agreement may enforce an unsigned or unwritten LLC agreement that would require more than a year to complete. We must adhere to the rules of statutory construction and, whenever possible, presume consistency between recent legislation and pre-existing law.[26] "Laws are assumed to be cumulative, not destructive of other laws."[27] We "assume[ ] that when the General Assembly enacts a later statute in an area covered by a prior statute, it has in mind the prior statute," and thus, "stat-utes on the same subject must be construed together so that effect is given to every provision unless there is an irreconcilable conflict between the statutes...."[28]

 The Delaware LLC Act does not address the relationship between LLC agreements and the statute of frauds. Olson argues, however, that the policy and provisions of the LLC Act evidence the General Assembly's intent to preclude the statute of frauds from LLC agreements. It is possible, as a theoretical matter, that the statute of frauds may not apply to LLC agreements, as a result of the LLC Act's implied repeal of the statute of frauds. But, repeal by implication is not favored.[29] We have long recognized that "unless it is expressly so provided, one act does not ordinarily repeal another, if both, in whole or in part, can be construed together."[30] We are "reluctant to find repeal by implication even when the later statute is not entirely harmonious with the earlier one," and "[i]f two statutes conflict somewhat, [we] must, if possible, read them so as to give effect to both, unless the text or legislative history of the later statute shows that [the legislature] intended to repeal the earlier one and simply failed to do so expressly."[31]

---

23. 6 *Del. C.* § 18–1101(b).

24. The Delaware LLC Act states, in pertinent part, that " '[l]imited liability company agreement' means any agreement (whether referred to as a limited liability company agreement, operating agreement or otherwise) written, oral or implied, of the member or members as to the affairs of a limited liability company and the conduct of its business." 6 *Del. C.* § 18–101(7).

25. *Id.*

26. *Hubbard v. Dunkleberger*, 659 A.2d 227, 1995 WL 131789, at *6 (Del. Mar. 16, 1995) (Order) (quoting *Du Pont v. Du Pont*, 87 A.2d 394, 399 (1952)).

27. *Id.*

28. *Fletcher*, 974 A.2d at 193 (quoting *State Dept. of Labor v. Minner*, 448 A.2d 227, 229 (Del.1982)).

29. *Hubbard*, 659 A.2d 227, 1995 WL 131789, at *6 (quoting *Du Pont*, 87 A.2d at 399).

30. *Id.*

31. *Fletcher*, 974 A.2d at 194 (quoting Sutherland, *Statutory Construction* § 23.09 at 338 (5th ed. 1991)).

### A. The LLC Act and Statute of Frauds Operate Together

Based on the rules of statutory construction, we must, if possible, construe the LLC Act and the statute of frauds together. Olson argues that the Delaware LLC Act's express intent to give maximum effect to LLC agreements precludes the statute of frauds from applying to those agreements, because the conflict between the underlying intent of the LLC Act and the statute of frauds renders them irreconcilable.

We disagree because we can construe the LLC Act and the statute of frauds together. We, therefore, we must give effect to both statutes. The statute of frauds does not conflict with the LLC Act anymore than the statute of frauds generally conflicts with contracts. The LLC Act does not guarantee enforcement of all oral or implied LLC agreements. Rather, the LLC Act, like many other contracts, treats LLC agreements by permitting oral, written, or implied agreements. The LLC Act's explicit recognition of oral and implied LLC agreements does not preclude the statute of frauds. Rather, such legislative recognition indicates that an LLC agreement operates like any other oral, written, or implied contract, i.e., it requires compliance with the statute of frauds.

The statute of frauds does not contravene the legislative policy of giving "maximum effect" to LLC agreements. The LLC Act cannot—and has not—rendered LLC agreements impervious to all other rules and laws relating to contract law. In no way does the LLC Act limit the types of substantive agreements that contracting parties may enter. The General Assembly did not clearly indicate any intent to advance this unlikely objective.

### B. The LLC Act's Text and Legislative History do not Remove LLC Agreements from the Scope of the Statute of Frauds

We will find an implied repeal only if the General Assembly clearly intended LLC agreements to be insulated from the operation of the statute of frauds. Olson claims that the stated policy of giving "maximum effect" to enforceability of LLC agreements clearly indicates the General Assembly's intent to remove LLC agreements from the scope of the statute of frauds. We disagree; neither the LLC Act's text, nor its legislative history supports that intent.

The legislative history of the LLC Act does not demonstrate the General Assembly's intent to place LLC agreements outside of the statute of frauds. When the General Assembly originally enacted the LLC Act in 1992, it only permitted written LLC agreements.[32] In 1995, the General Assembly amended the LLC Act to permit "any agreement, written or oral."[33] In 2007, the General Assembly further expanded the LLC Act to allow "implied" LLC agreements.[34] In its current form, Section 18–101(7) of the LLC Act provides that LLC agreements may be "written, oral or implied."[35]

Admittedly, these amendments to Section 18–101(7) clearly increase the contracting parties' flexibility to enter into LLC operating agreements. But, the amendments do not evidence any intent by General Assembly to remove LLC agreements from the reach of the statute of frauds. If anything, these amendments indicate the exact opposite. The General Assembly would have added an explicit provision during the course of any of their

32. 68 *Del. Laws* ch. 434, § 1 (1992).

33. 70 *Del. Laws* ch. 75, § 3 (1995).

34. 76 *Del. Laws* ch. 105, § 1 (2007).

35. 6 *Del. C.* § 18–101(7).

serial amendments, had it intended to place LLC agreements outside the statute of frauds. The General Assembly has the authority, of which it is well aware, to exclude LLC agreements from the operation of the statute of frauds if it so chooses.[36] Rather than specifically doing so, however, the General Assembly decided to permit more *types* of contracts under the LLC Act. We will not presume the General Assembly's intent to create a legal result that it omitted to specify—particularly where, as here, it repeatedly amended a statute and had multiple opportunities to clarify its intent as with the LLC Act. By providing that LLC agreements can be "written, oral or implied," we can infer only that the General Assembly intended to give "maximum effect" to LLC agreements by treating them similarly to most other contracts.

We infer from the policy stated in Section 18–1101(b) that the General Assembly intended the LLC Act to give maximum effect to the enforceability of LLC agreements. The General Assembly offered the limited liability company as an alternative to the corporate form for entrepreneurs and investors. In keeping with this legislative intent, we construe the "maximum effect" of LLC agreements as allowing governance terms not permitted under the more restrictive corporate paradigm. It is in that sense that the General Assembly intended to give "maximum effect" to the LLC, business entity formation and agreement.

 Because we can construe the statute of frauds and the LLC Act together and the General Assembly did not clearly intend the LLC Act to render the statute of frauds inapplicable, there is no implied repeal of the statute of frauds. As the Vice Chancellor stated, the statute of frauds should "protect defendants against unfounded or fraudulent claims that would require performance over an extended period of time."[37] The legislature enacted the statute of frauds over a century ago, and its purpose remains valid. If the General Assembly intends to limit the application of the statute of frauds by removing LLC agreements from its scope, the General Assembly must say so explicitly. "[We] will not do by judicial implication what the General Assembly itself has declined to do by express legislation."[38] Accordingly, we hold that the Delaware LLC Act does not preclude application of the statute of frauds to LLC agreements. Therefore, the statute of frauds applies to LLC agreements, and the Vice Chancellor correctly so held.

## III. The Statute of Frauds and the Multiple–Writings Exception

Olson does not claim that the statute of frauds is applicable to the earnout provision of the draft Founders agreement. What he does claim is that the unsigned, draft Founders agreement and the signed liquidation agreement satisfied the "multiple-writings" exception to the statute of frauds. Because the Vice Chancellor correctly found that the founders never superseded the "cap and comp" agreement,

**36.** The General Assembly expressly states that the LLC Act prevails over two other sections of the Delaware Code. Specifically, Section 18–1101(g) provides that "Sections 9–406 and 9–408 of this title do not apply to any interest in a limited liability company, including all rights, powers and interests arising under a limited liability company agreement or this

chapter. This provision prevails over §§ 9–406 and 9–408 of this title." 6 *Del. C.* § 18–1101(g).

**37.** *Olson,* 982 A.2d 286, 2008 WL 6745401, at *3.

**38.** *Fletcher,* 974 A.2d at 194.

that rendered Olson unable to establish a necessary element of his contract claim. Therefore, we decline to address this issue.

## CONCLUSION

We hold that the Vice Chancellor did not clearly erroneously conclude that the Viking founders never departed from the original "cap and comp" agreement, and that they were not obligated to pay Olson an earnout or the fair value of his interest in Viking. We further hold that the Delaware LLC Act does not explicitly remove LLC agreements from the application of the statute of frauds. Therefore, the statute of frauds applies to LLC agreements.

For the foregoing reasons, we **AFFIRM** the judgment of the Court of Chancery.