# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| URBAN GREEN TECHNOLOGIES, LLC, a Delaware limited liability company, | ) ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | |
| v. | ) ) | C.A. No. N13C-12-115 CLS |
| SUSTAINABLE STRATEGIES 2050 LLC, a Delaware limited liability company, and RAYOMAND BHUMGARA, | ) ) ) ) ) ) | |
| Defendants/Counterclaim Plaintiffs. | ) ) | |

Date Decided: February 8, 2017

## MEMORANDUM OPINION

Decision After Bench Trial
**Verdict for Defendants/Counterclaim Plaintiffs**

David G. Holmes, Esquire, Joseph Grey, Esquire, Cross & Simon, LLC, Wilmington, Delaware, Attorneys for Plaintiff/Counterclaim Defendant.

Brian T. N. Jordan, Esquire, Jordan Law, LLC, Wilmington, Delaware, Attorney for Defendants/Counterclaim Plaintiffs.

**SCOTT, J.**

# I.  Introduction

This is the Court's decision following a three-day bench trial relating to certain disputes arising from a contractual relationship between Urban Green Technologies, LLC, ("UGT"), on the one hand, and Sustainable Strategies 2050 LLC ("SS2050") and its President and sole and managing member, Rayomand Bhumgara ("Bhumgara") (collectively, "Defendants" or "Mr. Bhumgara"), on the other.

# II.  Findings of Fact

UGT is a Delaware Limited Liability Company in the business of dealing solar energy projects located in Chicago, Illinois.  UGT looks for suitable areas to build solar energy facilities and negotiates leases for the properties where these solar energy facilities are built. UGT uses consultants and contractors to develop the projects until the facility can be sold to a third party.  Defendant, Sustainable Strategies 2050 is also a Delaware Limited Liability Company located in Wellesley, Massachusetts.   The sole managing member and President of Sustainable Strategies is Defendant, Raymond Bhumgara.  The current CEO of UGT is Nikola Krneta, and the former CEO, Bob Berman, stepped down in 2015 when Mr. Krneta became the CEO.  Mr. Berman no longer has an active role in the company.   Mr. Bhumgara established Sustainable Strategies 2050 and began working primarily with solar energy in 2010.

1

While Mr. Bhumgara was in the real estate development business he met Palmer Cameron (hereinafter "Mr. Cameron"). In September 2010 Mr. Cameron called Mr. Bhumgara regarding UGT's interest in starting projects in Massachusetts. Specifically, UGT's interest was solar energy development, and UGT did not have ties to Massachusetts. Mr. Bhumgara met with Goran Rajsic, the CEO of Urban Green at the time, and Mr. Cameron in Chicago during October 2010. UGT agreed to pay him a retainer of $3,000.00 per month, plus expenses. His duties included identifying sites, doing site visits, attending board hearings, proposals, permit projects, and finding off-takers. Mr. Bhumgara testified that he initially asked UGT to pay him $5,000.00 per month given his involvement in the projects, but UGT was unable to meet this amount. The parties agreed he would start work on November 1, 2010, and Mr. Bhumgara sent a follow up e-mail on November 1 asking for a written agreement.

Mr. Berman was in Boston in June 2011. Mr. Bhumgara and Mr. Berman communicated about the initial three part agreement from 2010: retainer, expenses, and commission. On June 27, 2011 Mr. Bhumgara sent Mr. Berman a draft agreement. Pursuant to this draft, UGT would pay him a $3,000.00 per month retainer, reimbursement for reasonable expenses, and commissions within 30 days following the closing of a commercial financing of each potential project. The amount of commission was left blank, as Mr. Bhumgara testified, it was the

2

start of negotiations and he wanted UGT to make an offer. Mr. Berman acknowledged he received the e-mail with the attached agreement the same day. On July 8, 2011, Mr. Bhumgara contacted Mr. Berman via e-mail and requested Mr. Berman take time to look over the proposed agreement and compensation structure. Mr. Berman responded "Sure to all." Again on July 24, 2011 Mr. Bhumgara sent an e-mail to Mr. Berman asking him to find time to review the draft agreement Mr. Bhumgara sent on June 27. Mr. Berman responded on July 25, 2011 stating that he and Mr. Rajsic "discussed a plan that added $7,500.00 per megawatt of installed capacity not the properties you develop. Payable upon closing and financing." Mr. Bhumgara followed up with an e-mail on July 25, 2011 asking Mr. Berman to clarify the $7,500.00 per megawatt proposal. Specifically, Mr. Bhumgara asked whether the $7,500.00 per megawatt applied to properties he was involved in developing, properties he was not involved in developing, or only properties he identified and helped develop. Mr. Berman responded, "Yes to both." On July 26, 2011, Mr. Bhumgara stated that he was not clear on Mr. Berman's prior response, and asked Mr. Berman to be more specific in regard to his $7,500.00 per megawatt proposal. Mr. Berman responded that he was in Memphis and they would "clarify tomorrow."

Subsequently, Mr. Bhumgara sent an e-mail to Mr. Berman on July 27, 2011. Mr. Bhumgara explained that his market value based on other negotiated

3

agreements similar to UGT's project was between $50,000.00 and $75,000.00 per megawatt for every opportunity he identified. On September 1, 2011 Mr. Bhumgara sent an e-mail to Mr. Berman indicating that he would reach out to some of his contacts and identify new properties in Massachusetts. He indicated that he would be "more motivated" if the Parties "could reach an agreement on a results oriented fee structure (which would only be payable upon closing of the financing)." Mr. Bhumgara also indicated that UGT's July 25 proposed commission of $7,500.00 per megwatt was too low for his services. In October 2011 Mr. Bhumgara reached out to UGT again. This time he asked UGT to consider increasing his monthly retainer from $3,000.00 to $5,000.00. UGT continued to pay Mr. Bhumgara the $3,000.00 per month and the expenses owed to him. He also indicated that they could "discuss the performance based fee later."

Mr. Berman was in Boston in December of 2011 for a Planning Board meeting. Mr. Berman and Mr. Bhumgara discussed putting an agreement together, and Mr. Bhumgara testified that it focused on his commission. Mr. Bhumgara followed up with an e-mail on December 30, 2011. He stated, "as we discussed a few days ago, I need an agreement very soon as we continue our partnership into 2012 and beyond. Please discuss with Goran and send me your offer." Mr. Bhumgara acknowledged that the parties could either use the agreement he sent to UGT on June 27, 2011, or use an agreement UGT developed. Consequently, Mr.

4

Bhumgara sent Mr. Berman another e-mail on January 7, 2012 asking Mr. Berman to prioritize their compensation agreement, and that he was willing to negotiate a multi-tiered compensation agreement. Mr. Berman responded that he and Mr. Rajsic reached a preliminary agreement. On February 14, 2012 Mr. Rajsic sent Mr. Bhumgara an e-mail with a draft consulting agreement. Mr. Bhumgara replied on February 15, 2012 stating that he did not agree with the fee, and he would send a counter offer. Similarly, on February 17, 2012 Mr. Bhumgara sent an email to UGT stating that he would send a new draft agreement, and the gap between what he was paid on other projects ($50,000 to $75.000 per megawatt), compared to the amount UGT proposed, was too high. Mr. Bhumgara sent a markup of the agreement with his comments on February 27, 2012.

As of March 2012, the Parties had not signed an agreement, and Mr. Bhumgara did not receive his monthly retainer and expenses from UGT. Mr. Bhumgara notified Mr. Berman via e-mail. Mr. Bhumgara and Mr. Berman met between March 19, 2012 and March 20, 2012 in Boston. Mr. Berman and Mr. Bhumgara discussed the compensation agreement. Mr. Bhumgara testified that he ultimately told Mr. Berman that he could agree to $35,000.00 per megawatt for all projects he worked on that sold. Mr. Bhumgara received a call on March 22, 2012 from Mr. Berman who agreed to pay $35,000.00 per megawatt. Mr. Bhumgara sent Mr. Berman an e-mail on March 26, 2012 stating that he would revise an

5

agreement based on the terms they agreed to, and clarify his role and responsibilities.

Mr. Bhumgara sent a revised agreement to Mr. Berman on March 27, 2012. This revised agreement stated that UGT would pay Mr. Bhumgara a $3,000.00 monthly retainer, expenses, and $35,000.00 per megawatt for projects identified by him and/or projects he provided active development support in. Mr. Berman received this document, and no agreement was signed, nor were there any further communications about this agreement. In March 2013, a full year later, Mr. Bhumgara testified that the projects were advancing and he was putting a lot of time into the UGT projects. Mr. Berman came back to Boston, and he expressed concerns to Mr. Bhumgara about the projects. Mr. Berman was unsure if they would get buyers for the project, and he told Mr. Bhumgara that he wanted to modify the agreement. Mr. Berman wanted to modify the agreement because the $35,000.00 per megawatt commission was not tied to the sale price of the project. On March 18, 2013 Mr. Bhumgara sent Mr. Berman an e-mail to follow up with their conversation about a fee agreement, and attached a new agreement. Mr. Bhumgara sent more follow up e-mails regarding his compensation, which ultimately led to this litigation.

The parties stipulated at trial that Defendant was paid a total of $138, 664.48, which consisted of $3,000.00 per month for 39 months beginning on

6

November 23, 2010 and ending December 3, 2013, and $21,664.48 in total expenses.[1] Although Mr. Bhumgara worked on other projects with UGT, there are three specific projects subject to this litigation: Billerica, Lancaster, and Oxford. All three project sites are located in Massachusetts, and each project sold.

### III.  Parties' Contentions

UGT argues that although it had an oral contract with Defendants to pay a monthly retainer and expenses, UGT is not contractually bound to pay Defendants commission on the Projects because the agreements did not produce a signed writing.  Specifically, UGT argues that Defendants cannot prove that a contract was formed between the parties in March 2012.  Defendants counterclaim is for breach of contract based on the March 27, 2012 document Mr. Bhumgara sent to UGT.  Defendants argue that this agreement is an enforceable contract because there was a meeting of the minds between the Parties.  UGT argues that the March 27 agreement is not an enforceable contract; rather it was a counteroffer to UGT's February 14 offer.  Further, UGT argues that even if the March 27 agreement is not considered a counteroffer, it cannot constitute an modification of the March 2012 agreement due to lack of new consideration.

---

[1] Trial Tr., at 3:19-5:3, June 7, 2016.

7

## V. Discussion

The primary issues before the Court are: (1) what rights and duties were created by the Parties 2010 oral agreement; (2) whether the Parties orally agreed to modify or replace the 2010 agreement in March, 2012; (3) if so, whether the statute of frauds prevents Bhumgara's enforcement of the 2012 agreement; and (4) if so, whether Bhumgara can recover under a theory of quantum meruit.

### A. Contract Formation

Generally, contract formation is a question of fact under Delaware law.[2] To prove an enforceable contract exists, the following three elements must be shown: (1) the parties' intent to be bound by the contract; (2) sufficiently definite terms; and (3) consideration.[3] "The parties' intent is a question of fact to be determined from overt acts and statements of the parties."[4] Thus, there must be a meeting of the minds.[5] The Court will look at the "ordinary meaning of the language used in writings reflecting agreements and the course and substance of negotiations to determine if a contract has been formed."[6] A contract is not "formed unless there has been a valid acceptance.[7] This state "follows the mirror image rule, requiring

---

[2] *LCT Capital, LLC v. NGL Energy Partners LP*, 2016 WL 5793724, at *6 (Del. Super. Ct. Oct. 6, 2016).

[3] *Id.*

[4] *Bouchard Margules and Friedlander v. Gaylord*, 2005 WL 2660043, at *5 (Del. Super. Ct. Aug. 31, 2005).

[5] *Id.*

[6] *Id.*

[7] *Johnson v. Rooney*, 2011 WL 2178693, at *2 (Del. Super. Ct. May 25, 2011)(citations omitted).

8

the acceptance to be identical to the offer."[8]  For the Court to consider a contract enforceable, "all the material terms must be included in the contract."[9]  Although a counter-offer does not constitute valid acceptance,[10] silence is a manner of acceptance.[11]

The three relevant dates in this case are: October 2010, March 2012, and March 2013.  The Court finds that a meeting of the minds existed beginning in October 2010.  In October 2010, the Parties met in Chicago seeking Mr. Bhumgara's services.  The meeting resulted in a three part compensation agreement.  UGT agreed it would pay Mr. Bhumgara $3,000.00 per month as a retainer fee plus expenses.  Mr. Bhumgara initially bargained for $5,000.00 per month, plus expenses, but UGT was unable to tender that amount. Mr. Bhumgara agreed to a $3,000.00 per month retainer with the possibility of revisiting an increase.  As to Mr. Bhumgara's commission for working on UGT projects, he testified that his commission was to be determined. The Parties' intent to be bound by this agreement is shown through UGT's prompt payments of Mr. Bhumgara's retainer and expenses. Mr. Bhumgara testified that the agreed upon start date was

---

[8] *Id.*
[9] *Id.*
[10] *See PAMI-LEMB I Inc. v. EMB-NHC, LLC,* 857 A.2d 998, 1015 (Del. Ch. 2004)("A response to an offer that is not on the terms set forth by the offeror constitutes a rejection of the original offer and counteroffer").
[11] *See Hornberger Mgmt. Co. v. Haws & Tingle General Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000).

9

November 1, 2010, and both Parties agreed that his monthly retainer and expenses were properly paid.

Post October 2010, the Parties exchanged months of negotiations to finalize his commission. To form a contract, "the parties must negotiate all terms they deem important *and* intend to be bound."[12] As the Court of Chancery has stated, "[n]egotiations typically proceed over time with agreements on some points being reached along the way towards a completed negotiation. It is when all of the terms that the parties themselves regard as important have been negotiated that a contract is formed."[13] The Parties negotiated for months regarding Mr. Bhumgara's compensation for the completed UGT projects. These negotiations are evidenced in e-mails, as well as through Mr. Bhumgara's testimony regarding oral negotiations between him and Mr. Berman. Between October 2010 and March 2012 Mr. Bhumgara sent many e-mails with draft documents to Mr. Berman encouraging him to reach an agreement regarding Mr. Bhumgara's commission. Mr. Berman and Mr. Rajsic subsequently sent their own proposal to Mr. Bhumgara in February 2012 which proposed removal of Mr. Bhumgara's $3,000.00 per month retainer. Mr. Bhumgara rejected UGT's commission proposal and asked UGT to reinstate his monthly retainer and expenses.

---

[12] *Louisiana Mun. Police Employees' Ret. Sys. v. Black,* 2016 WL 790898, at *3 (Del. Ch. Feb. 19, 2016).

[13] *Leeds v. First Allied Connecticut Corp.,* 521 A.2d 1095, 1101 (Del. Ch. 1986).

After meeting with Mr. Berman in Boston in March 2012, Mr. Bhumgara sent Mr. Berman an agreement on March 27, 2012 which included a negotiated commission for $35,000.00 per megawatt, and reinstated his monthly retainer and expenses. The Parties' intent to be bound by this agreement is shown from UGT's reinstatement, and continuous, payments of Mr. Bhumgara's $3,000.00 per month retainer, plus expenses. Subsequently, Mr. Bhumgara continued to act as UGT's project consultant. It was understood that Mr. Bhumgara was UGT's "go to guy" in Massachusetts. Mr. Bhumgara is the President of Sustainable Strategies 2050, which is located in Massachusetts. Mr. Bhumgara had the experience and contacts in Massachusetts that UGT needed in order to launch their solar projects in the State. Mr. Bhumgara testified that his duties were to identify sites, perform site visits, attend hearings, permit projects, finding off-takers, and proposals. Furthermore, UGT did not object to this agreement, nor Mr. Bhumgara's performance, until March 2013 when the three projects subject to this litigation moved towards completion.

UGT argues that the March 27, 2012 agreement cannot be considered a contract because it is a counter-offer to UGT's February 14 offer. Even assuming that the March 27 document sent by Mr. Bhumgara to UGT was a counter-offer, UGT accepted this offer by silence. Under the Restatement, "[w]here any offeree fails to reply to any offer, his silence and inaction operate as an acceptance . .

11

[w]here the offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation."[14] Mr. Bhumgara was never told to stop working on UGT's projects, and UGT said nothing more about their agreement until March 2013. Mr. Bhumgara continued to perform his job, and UGT had ample opportunity to reject this agreement. Mr. Berman did not testify, thus, the Court gave great weight to Mr. Bhumgara's testimony and found him as a credible witness. Similarly, most of Mr. Bhumgara's testimony was corroborated with follow up e-mails throughout the course of UGT's relationship with Mr. Bhumgara. The Court gave almost no weight to UGT's CEO, Mr. Krneta's, testimony. Mr. Krneta's employment with UGT did not coincide with Mr. Bhumgara's employment until June of 2013, and he did not formally become an employee of Urban Green until January 2014. Further, it appears from Mr. Krneta's testimony that he did not possess first hand knowledge about the relationship between Mr. Bhumgara and UGT, nor Mr. Bhumgara's responsibilities on each project. Thus, this Court finds that a meeting of the minds existed in the March 27, 2012 agreement.

The Court does not find that the communications from March 2013 and on modified the March 27, 2012 agreement. Once a contract is formed, "no

---

[14] *See Hornberger Mgmt. Co. v. Haws & Tingle General Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000).

12

modification of it could be brought about without the consent of both parties and without consideration."[15] The ongoing negotiations beginning in March 2013 did not modify the contract because, as demonstrated through e-mails and testimony, consent of both parties to a new agreement did not exist. The language in the e-mails starting March 18, 2013, corroborated with Mr. Bhumgara's testimony, shows that the Parties' spoke in person about modifying their March 2012 agreement. Mr. Bhumgara's e-mail on March 18, 2013 states "the fees I have proposed are at the lower end of the agreements I have negotiated with other developers." Mr. Bhumgara sent a follow up e-mail on April 21, 2013 stating "I am willing to work with you on the schedule for payment, and defer some of the payment, if you will agree to the fee structure I have proposed." On June 11, 2013, Mr. Bhumgara stated that he "outlined a revised fee agreement below," and he "moved from a $/watt fee to a % fee model (to completely align our interests) and now I have agreed to further reduce the % and defer part of the compensation." Finally, in August 2013, Mr. Bhumgara sent another draft modification to Mr. Berman, and the communications continued through November 2013. It is clear that there was not consent, or a meeting of the minds, of both Parties to modify an already existing contract. There was ample evidence regarding the company's

---

[15] *De Cecchis v. Evers*, 174 A.2d 463, 464 (Del. Super. Ct. 1961); *See also Affordable Autos, Inc. v. Dietert*, 2016 WL 1169244, at *4 (Del. Super. Ct. Mar. 24, 2016)(stating that "Delaware decisional law provides that a contract may only be modified when there is consideration and the consent of *all* the parties").

13

financial struggle, and Mr. Berman's acknowledgement of this financial difficulty. The Court believes that UGT's reluctance to sign an agreement with Mr. Bhumgara was a conscious decision to avoid paying Mr. Bhumgara a commission for these projects. For the aforementioned reasons, a meeting of the minds between the Parties existed on March 27, 2012.[16]

## B. Statute of Frauds

Delaware's statute of frauds provides "that parties must reduce to writing, and the defending party must have signed, any agreement that cannot be completed within one year from its making."[17] Thus, an agreement will not be enforced if it "is not to be performed within the space of one year from the making thereof, unless it is (1) written and (2) signed by the party against who the agreement is to be enforced."[18] Further, "only if the parties cannot possibly perform the agreement within one year does the statute of frauds apply and require a writing signed by the charged party."[19] There is no evidence in the present case that the parties could not possibly perform the agreement within one year. Although there was testimony from Mr. Krneta that the average project took two years, under Delaware law the

---

[16] The Court recognizes that a provision in this March 27 Agreement states that the Agreement shall be governed by the laws of the State of Illinois and "any breach thereof shall be resolved . . . by litigation only in Illinois or the Federal Court otherwise having subject matter jurisdiction over the dispute and not elsewhere." Neither party objected to Delaware as the proper venue. Similarly, neither party objected to the application of Delaware law. All briefing in the case has cited to Delaware case law.

[17] *Olson v. Halvorsen*, 986 A.2d 1150 (Del. 2009); *see also* 6 *Del. C.* § 2714(a).

[18] *Id.* at 1159.

[19] *Id.* at 1159.

statute of frauds applies only if the parties "cannot possibly perform the agreement within one year." Mr. Bhumgara's unrebutted testimony was that a project could be completed in ten months.[20] Thus, Statute of Frauds does not bar enforcement of the March 2012 agreement.

### C. Quantum Meruit

If a party cannot recover under a contract claim, relief may be found in quasi-contract claims, such as quantum meruit. Quantum Meruit "means as much as he deserves."[21] However, "[i]f there is an enforceable contract between the parties, *quantum meruit* recovery is inapplicable."[22] Quantum meruit is a "quasi-contract claim that allows a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid."[23] If the Court did not find that an enforceable contract existed as of March 2012, Defendants are able to recover under quantum meruit. Mr. Bhumgara performed services for UGT over a period of approximately 39 months. Mr. Bhumgara testified that he went to board meetings, site visits, he was

---

[20] Trial Transcript, 69:16-70:1, June 7, 2016.
[21] *C & C Drywall Contractor, Inc. v. Milford Lodging, LLC,* 2010 WL 1178233, at *3 (Del. Super. Ct. Jan. 13, 2010).
[22] *Middle States Drywall, Inc. v. DMS Properties-First, Inc.,* 1996 WL 453418, at *10 (Del. Super. Ct. May 28, 1996), *aff'd sub nom. DMS Properties First, Inc. v. Middle States Drywall, Inc.*, 692 A.2d 412 (Del. 1997).
[23] *Petrosky v. Peterson*, 859 A.2d 77, 79 (Del. 2004)(citing *Construction Systems Group, Inc., v. Council of Sea Colony, Phase I,* 1995 WL 622421, (Del. Sep. 28, 1995).

the Massachusetts contact for UGT, and he dedicated large amounts of time to UGT projects. Through Mr. Bhumgara's testimony, and the e-mails between Mr. Berman and Mr. Bhumgara, Defendants have shown by a preponderance of the evidence that UGT should have known Mr. Bhumgara expected a commission. Throughout their entire employment relationship, e-mails between Mr. Berman and Mr. Bhumgara demonstrate that Mr. Bhumgara believed he would receive compensation for projects that sold. Most of the e-mails between Mr. Berman and Mr. Bhumgara are in regard to negotiations of solely the amount of compensation UGT would pay Mr. Bhumgara if a project sold. Because the Court found for Defendants on a breach of contract claim, damages under quantum meruit do not need to be analyzed.

## VI. Conclusion

For the reasons set forth above, UGT owes Defendants $35,000.00 per megawatt, pursuant to the March 27, 2012 agreement. The Court requests Defendants submit a memo within fourteen days on the total amount of damages.

**IT IS SO ORDERED.**

/S/ CALVIN L. SCOTT
**Judge Calvin L. Scott, Jr.**

16